**BROADVIEW CHEMICAL CORPORA-TION, Plaintiff-Appellant,**

v.

**LOCTITE CORPORATION, Defendant-Appellee.**

Nos. 219, 220, Dockets 32722, 32723.

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1968.

Decided Jan. 23, 1969.

Certiorari Denied April 21, 1969. See 89 S.Ct. 1472.

Granger Cook, Jr., Chicago, Ill. (Hume, Clement, Hume & Lee, Chicago, Ill., David A. Anderson, James P. Hume and Henry L. Brinks, Chicago, Ill., of counsel), for plaintiff-appellant.

Walter D. Ames, Washington, D. C. (Watson, Cole, Grindle & Watson, Robert J. Lasker, Washington, D. C., J. Rodney Peck, Newington, Conn., and W. Robert Hartigan, Hartford, Conn., of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and FRANKEL, District Judge.*

FRANKEL, District Judge:

In June of 1964 Broadview Chemical Corporation, the plaintiff-appellant, brought the action from which this appeal arises seeking a declaration of invalidity and non-infringement with respect to several patents held by Loctite Corporation, the defendant-appellee. Following counterclaims charging infringement and a course of discovery proceedings, the parties, on February 3, 1967, made a settlement agreement which provided for, and incorporated, the consent decree Broadview has now been found to have violated. Some limited aspects of the patents and of the steps preceding the settlement are germane to the issues on this appeal.

The patents cover anaerobic curing sealant compositions which serve to bond metals together in the absence of air (specifically, oxygen)—e.g., when spread upon the surface of a screw and bolt which, upon being threaded together, exclude air and are thereby made to adhere to each other through the action (polymerization) of the patented composition. In the course of discovery, responding to Loctite's interrogatories, Broadview listed the 32 formulations, designated by Roman numerals I–XXXII, of the sealant compositions it was making and selling. Thereafter, in a stipulation of facts dated May 31, 1966, the parties agreed in the following language that Loctite's charges of infringement (and the "issues" generated by such charges) were rested upon three patents and directed against the several formulations, as follows:

"The claims of Loctite Corporation's patents which are in issue and are charged to be infringed by Broadview Chemical Corporation products and the Broadview Chemical Corporation products from among the formulations given in the answers to Loctite Corporation's interrogatories which are charged to infringe the Loctite Corporation patents and which therefore are in issue are as follows:

| Claims | Product Formula No. |
|---|---|
| 1, 2, 5, 8, 10 and 27 of Patent No. 2,895,950 | III, V–XXVIII inclusive and XXX–XXXII inclusive |
| 1, 2, 4 and 11–14 of Patent No. 3,043,820 | IV–VI inclusive IX–XII inclusive XVI, XXIV, XXV, XXVI, XXVIII and XXXII |
| 9 of Patent No. 3,043,820 | V, VI, IX–XII inclusive XVI, XXIV, XXV, XXVI, XXVIII and XXXII |
| 1, 2 and 4–6 inclusive of Patent No. 3,046,262 | II, III, V and VI" |

---

* Of the Southern District of New York, sitting by designation.

In other words, Loctite charged that 30 of Broadview's 32 formulations (Nos. II through XXVIII and XXX through XXXII) infringed one or more of the patents. Two of the formulations, Nos. I and XXIX, were omitted from this listing of "the Broadview * * * products from among the formulations given in the answers to Loctite Corporation's interrogatories which [were] charged to infringe * * * and which therefore [were] in issue * * *."

The settlement agreement of February 3, 1967, among its other relevant aspects, incorporated the stipulated description of the "charges" and the "issues" in the case, and tied these to the consent decree, by providing (par. 5):

> "The Broadview formulations referred to in the Consent Decree (Exhibit 1) are:
>
> Formulations II through XXVIII inclusive.
>
> Formulations XXX through XXXII inclusive."

And the consent decree, as thus described, after announcing, *inter alia*, that the parties had "settled their differences with respect to the matters in dispute," adjudged that Broadview had infringed "Patent Nos. 2,895,950; 3,043,820 and 3,046,262 by the manufacture and sale of products made under formulations covered by said Letters Patent * * *."

The decree went on to enjoin further infringement of the named patents; to provide that each party would pay its own costs and attorneys' fees; and to state that there should be no award of damages since Broadview had "made a monetary payment" ($7,500) to Loctite under the settlement agreement.

The peaceful era thus inaugurated was short. In September, 1967, Loctite moved to punish Broadview for contempt of the consent decree, charging that the latter was making and selling named products which infringed claims of Patent No. 3,043,820. Following a hearing

and some discovery, Loctite filed a supplemental motion charging as further contumacious acts that:

(1) Broadview had "resold substantial quantities of admittedly infringing compositions more than five months after" the signing of the consent decree.

(2) Broadview's present formulations CP–1 through CP–9 were "but colorable imitations of" prior formulations which had admittedly infringed Patent No. 3,043,820.

(3) Broadview's formulations CP–1 to CP–7 infringed Patent No. 3,046,-262.

After discovery proceedings and three days of evidentiary hearings, Judge Blumenfeld concluded that all the contempt charges should be sustained. He held, first, that the "resales" of the old, admittedly infringing formulations violated the decree. Further, he found that all of Broadview's assertedly new formulations (identified as CP–1 through CP–9), contrary to the decree's prohibitions, infringed either Patent No. 3,043,820, or No. 3,046,262, or both. In a detailed opinion, he explained the bases for these determinations and prescribed remedial sanctions.

In its appeal Broadview tenders five questions (we formulate them as four) on which it claims the District Court erred.* We reject all of these contentions save one, the effect of our ruling being to absolve only Broadview's new compositions CP–8 and CP–9 from the charge of contempt.

## I.

■ As is true of substantially all the District Court's fact findings, there is no quarrel by Broadview with the findings that: (1) Broadview's distributors, after the consent decree, began returning the products which had been declared to infringe; (2) Broadview in some cases resold such returned

---

* Loctite filed a notice of cross-appeal, evidently designed to assert some question about the relief adjudged for the contempt, but was permitted to withdraw it at the oral argument.

products to other distributors; and (3) in other cases, Broadview arranged for direct transfers of such products from one distributor to another, crediting the transferor with what amounted to returns and billing the transferee for purchases. Broadview argues, however, that these post-decree transactions were outside the terms of the injunction because Loctite, in the settlement agreement, had given a standard form of release "of and from any and all actions, causes of action, claims and demands which Loctite Corporation may have against [Broadview, its officers, customers, etc.] jointly or severally, from the beginning of the world to the date hereof." The argument is not weighty.

The consent decree adjudged that Broadview had infringed by "manufacture and sale" of the condemned products. It enjoined such infringement for the future. Cf. Western Lighting Corp. v. Smoot-Holman Company, 352 F.2d 1019, 1022 (9th Cir. 1965). The release, because Broadview was making an agreed payment for the past, waived any claims for infringement, whether by "manufacture" or "sale," up "to the date" of the settlement. There was no suggestion in the customary language of the release that it was intended to excuse any acts of infringement (whether by manufacture or by sale of products already in existence) after its date. There was no hint of the thought now pressed that the release gave immunity for any future sales or uses of products in existence as of its date. And Broadview introduced no evidence in the contempt hearing to suggest that the parties had intended any such unusual meaning. On the contrary, answering interrogatories during the contempt proceedings, Broadview's President said he believed "part or all" of the infringing products in Broadview's possession on the date of the consent decree had been "discarded or destroyed" and that none had been "transferred to another for consideration * * * monetary or otherwise." True or false, these answers were consistent with the terms of the decree and the release, not with the unlikely construction Broadview now proposes.

II.

Insofar as Judge Blumenfeld's findings of contempt rest upon his determination that Broadview has, since the consent decree, made and sold compositions infringing Patent No. 3,043,820, Broadview attacks his decision in an elaborate argument charging (1) that he mistakenly failed to consider the prior art and (2) that he improperly limited discovery with respect to the prior art. These interrelated contentions, to which there are short answers, may be summarized briefly for our purposes.

As Broadview states the starting-point for this line of argument, it is that Patent No. 3,043,820 "covers compositions including (1) a dimethacrylate (monomer), (2) a hydroperoxide (catalyst), and (3) a quinone (inhibitor)." Elaborating this summary, Broadview stresses that the inclusion of hydroquinone, as distinguished from quinone, "was old and in the public domain." Thus, the argument continues, "by using or adding hydroquinone to the accused sealant compositions, Broadview is following the prior art and is not infringing * * *."

Insofar as this argument rests upon the specific ingredients of Broadview's formulations, it is frivolous. All of the admittedly infringing formulations under the consent decree showed hydroquinone as an ingredient; none showed quinone. Thus, it was obviously not required that quinone appear as a specific ingredient in the formulation in order to make the formulation an infringement. It is not more meritorious to contend, as Broadview does, that the quinone now to be found in its post-decree compositions can only result from the use of hydroquinone and *must*, therefore, be no more than *must have* been present in the prior art. The trouble with this undocumented assertion is that it is flatly opposed to Judge Blumenfeld's finding that Broadview's products made since the decree contain quinone

which is not, and cannot be, accounted for by the use of hydroquinone. Without actually assailing that finding, which is solidly grounded in the record, Broadview argues as if it did not exist. The argument must obviously fail.

■ The point about limited discovery regarding the prior art is an even shorter subject. Having examined the pertinent portions of the record, we find that Judge Blumenfeld actually placed no restrictions like those now suggested upon Broadview's inquiries. Two of the four interrogatories in question were answered to the expressed satisfaction of Broadview's attorney. The same attorney suggested that rulings on the other two be deferred. His failure thereafter to revive the matter, reflecting its essential triviality, can scarcely ground a claim of error by the District Judge.

### III.

As one of its determinations that the decree had been violated, the District Court found that Broadview's new formulations CP–1 through CP–7 infringe Patent No. 3,046,262. This patent, informally labelled the "saccharin patent" by the parties, is sufficiently identified for present purposes by (1) its provision for inclusion of a sulfimide (e. g., saccharin) accelerator for rapid curing and (2) its teaching that the composition should "exclude" or be "free from amines" in order to promote long shelf life. It is undisputed that Broadview's CP–1 through CP–7 contain saccharin. It is also undisputed that they contain what Broadview describes as a "minor amount of amines" in the range of from 0.025 to 0.05 per cent by weight. In a fruitless discourse on "file wrapper estoppel," Broadview undertakes to show that this faint trace of amines, too slight to have any effect of any kind, avoids Loctite's patent.

Coming to grips with the Patent Office history, Loctite has shown persuasively that file wrapper estoppel is not really a relevant concept at all—that the provision for having the composition "free from amines" was not inserted in the requisite sense to narrow the claims "in order to obtain the issuance of a patent by distinguishing the prior art * * *." Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966); see also I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 444, 47 S.Ct. 136, 71 L.Ed. 335 (1926); Waring Products Corp. v. Landers, Frary & Clark, 263 F.2d 160, 165 (2d Cir. 1959). But there is no need for us to linger over that; even if there were in the file wrapper history some ground for arguing that the saccharin patent may not be read upon compositions containing some meaningful amount of amines, the argument becomes a fictional abstraction when it is related to such a tincture of physically insignificant amines as Broadview has used to avoid the patent.

■ The patent, the file wrapper history, and the evidence before Judge Blumenfeld all had reference to a practice in the prior art of using amines as accelerators in the range of 0.5 to 5.0 per cent by weight. Loctite's '262 patent taught that such use of amines reduced shelf life and should, therefore, be avoided "when shelf life is desired." Seizing upon words out of context like "free from amines" or that amines should be "excluded," Broadview fashions its estoppel argument by merely referring to its use of a "minor amount of amines," ignoring the undisputed fact that this "minor amount" is as effective as no amines at all so far as its impact upon shelf life or anything else is concerned. But it is old and obvious learning that a patent may not be avoided by making "unimportant and insubstantial changes and substitutions in the patent which, though adding nothing," are then put forth as answers to infringement charges. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); see also Bewal, Inc. v. Minnesota Mining and Manufacturing Co., 292 F.2d 159, 165–167 (10th Cir. 1961). That essential principle applies

here, as elsewhere. The patent field is not the only one where due enforcement of the law requires penetrating to the substance behind "sophisticated as well as simple-minded" devices. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).

## IV.

The remaining point, the one on which we sustain Broadview's appeal, is this: Broadview's new formulations CP–8 and CP–9 are identical, respectively, with its former Nos. I and XXIX. The latter two, it will be recalled, were the only ones of the total of 32 omitted when Loctite was asked in interrogatories to state which of Broadview's compositions it accused. Accordingly, when the parties came to stipulate the facts, 30 formulations (II through XXVIII and XXX through XXXII) were listed as those "charged to infringe" and "therefore" as being "in issue." Similarly, the same 30 formulations were described in the settlement agreement as being the ones "referred to in the Consent Decree (Exhibit 1)." The single reference in the consent decree to which that description had to relate was paragraph 3, which said:

> "That Plaintiff has infringed said United States Letters Patent Nos. 2,-895,950; 3,043,820 and 3,046,262 by the manufacture and sale of products made under formulations covered by said Letters Patent * * *."

Against that background, Broadview urged in the District Court (and here) that Loctite was "estopped" to claim contempt with respect to CP–8 and CP–9, the current replicas of I and XXIX. Rejecting that thesis, Judge Blumenfeld observed that he could not "either expand or contract the decree," and went on to note, correctly, that "[n]either the consent decree nor the settlement agreement specifically stated that any of Broadview's formulations were non-infringing." CP–8 and CP–9, he found, while identical to I and XXIX, were "substantially the same" as former No. IV,

which had been accused by Loctite in the proceedings before the decree as an infringement of Patent No. 3,043,820. Moreover, he found, the "differences" between CP–8 and CP–9 (or I, and XXIX), on the one hand, and IV, on the other, "are not significant." Accordingly, he concluded, CP–8 and CP–9 infringe because IV, substantially the same, was "admittedly infringing."

■ Like Judge Blumenfeld, we find unhelpful Broadview's claim of an estoppel affecting this subject. We conclude, however, that CP–8 and CP–9 may not be held to infringe—and may not, therefore, supply part of the basis for a contempt order. We rest this conclusion upon what we believe to be a more accurate and persuasive reading of the consent decree, in its context, than that urged by Loctite.

In the dealings leading to the consent decree the parties had Broadview's 32 formulations, clearly, explicitly, and steadily before them. Loctite reviewed all of these, and then stated specifically which of the patents (one or more) were claimed to be infringed by each one. It made no claim under any patent against either I or XXIX. The charges against the other 30 were then stipulated as defining the controversy—as identifying the products "which therefore [were] in issue * * *." Then the consent decree, building upon this framework, resolved the issues by adjudging that the 30 specified formulations were infringements.

It is true there was no recital that Nos. I and XXIX were "non-infringing." Nor was it said expressly that they were "not in issue." But the omission of these two formulas had the unmistakable effect of dropping available "issues" and excluding obviously available "differences" from those the consent decree was designed to settle. Such striking omissions, in a setting like this, amount to the plainest kind of tacit understanding that the two items not included were distinguished deliberately and meaningfully.

**544**

Loctite's contrary view is not supported, but is impaired, by the finding that CP–8, CP–9 and IV (admitted to infringe) "are substantially the same and their differences are not significant." The same, by definition, had to be true of I, XXIX, and IV when the first two were omitted, and the last one included, in the consent decree. That narrow distinction has every appearance, therefore, of a purposeful and bargained result rather than an oversight. In these circumstances, we cannot read the consent decree as if it included what it omitted—which is, of course, the result of the interpretation pressed by Loctite.

The order of the District Court is affirmed, except for the finding of contempt with respect to CP–8 and CP–9, which is reversed. The case is remanded for further proceedings consistent with this opinion.